THE PEOPLE, *ex rel.* Ela N. Merriam, *vs.* MARIUS SCHOON-MAKER, auditor of the canal department.

Under the act of 1854, (*Laws, ch.* 270,) authorizing an appeal to be made to the general term from any judgment, order or final determination made at any special term of the court, in any special proceeding therein, an appeal lies from an order directing a *mandamus* to issue.

There has never been any permanent appropriation, by the state, of the waters of the Black river, so as to entitle the owners of hydraulic power below the state dam and feeder to call for an appraisal and payment of the whole value of their water power.

The canal commissioners had the power, under the act of 1833, to divert the waters of the stream, temporarily, to supply a deficiency of water in the Erie canal; and having exercised that power, they were authorized to settle and adjust the damages sustained by the riparian owners.

And a canal commissioner having adjudicated upon the claim of a mill-owner, for damages sustained by means of a temporary diversion of the water, and having fixed and agreed upon a specific sum to be paid him, for such damages, and drawn his draft upon the auditor of the canal department, for the amount, it is the duty of the auditor to pay the draft; and he may be compelled to do so, by mandamus.

The act of 1848, creating the office of auditor, conferred upon him no power to look behind the draft, and adjudge that the commissioner was without the authority to make it. His powers and duties are strictly of a ministerial character.

AN order was obtained for the defendant to show cause why a peremptory mandamus should not issue to compel the defendant to pay a draft of $648, which had previously been given to John Post, a mill-owner on the Black river, below where the water is taken out of the river for the supply of the Black river

and Erie canals, for diversion of water from said Post's mill for the use of said canals. The draft was given by Hon. C. Gardinier, canal commissioner, and had been duly transferred to the relator. At a special term held in the city of Albany, in June, 1854, a mandamus was directed to be issued, accordingly; and from that order the defendant appealed.

*H. D. Faulkner*, for the relator.

*J. H. Reynolds*, for the defendant.

*By the Court*, WRIGHT, J. It is objected, preliminarily, that the appeal is improperly brought. It was taken under the statute of 1854, authorizing an appeal to the general term "from any judgment, order or final determination made at any special term of the court, in any special proceeding therein." (*Laws of* 1854, *ch.* 270.) The argument is that a *mandamus* is in the nature of an action, unaffected by the code of procedure, or its provisions relative to appeals, and is not a "*special proceeding*," within the meaning of the act of 1854. We are of the opinion that the law referred to authorizes the appeal.

In 1849 and 1850, John Post was the owner of a saw-mill on the Black river, some 14 miles below the state dam, which mill had been and was used and operated by him. For the purpose of supplying the Erie canal with water, the canal commissioner in charge caused the waters of the Black river to be totally diverted from Post's saw-mill and the Black river, through the feeder of the Black river and Erie canals for the period of sixty days in the year 1849, and forty-eight days in the year 1850. There is nothing in the case showing an intention on the part of the officers of the state to make permanent appropriation of the Black river to the use of the state. It is true that a dam has been erected on the river with the view of raising the water and passing a portion of it on through a feeder to the summit level of the Black river canal, for the purpose of supplying in part the Black river and Erie canals. It is made the duty of the canal commissioners, whenever the navigation of any of the

canals shall be interrupted or endangered by reason of a deficiency of water, without delay to supply such deficiency; and they are empowered to enter upon and use all lands, streams and waters which in their judgment may be necessary or proper to be used to procure a temporary supply of water for such canals. (*Laws of* 1833, *ch.* 196.) And the acting commissioner on the line of the canal nearest to the lands, streams and waters, or any engineer or superintendent of repairs, authorized by him, may fix by agreement the amount of damages which the owner ought to receive.

The state officers have heretofore chosen not to permanently appropriate the Black river to the use of the state, and thus subject the state to heavy damages to be claimed by mill owners below the dam, but to make temporary appropriations of the water of the river, agreeing with the riparian owners as to the damages incurred by such temporary appropriation and use. In using the water, they have acted under the authority of the act of 1833, determining that the use was for a temporary purpose, and taking no steps or doing any act, showing a clear intention to permanently appropriate the river to the use of the state, to the destruction of the property and privileges of the riparian owners.

In this case, the acting canal commissioner treated the use of the water and the diversion of it from Post's saw-mill as temporary and for a temporary purpose, authorized by the act of 1833, and indeed all the facts in the case show that there never has been an exclusive and permanent appropriation of the stream for state purposes. It must be conceded that if there was no permanent appropriation of the river to the use of the state, then the canal commissioner possessed the power, under the act of 1833, to use the waters, to divert them from the mill owners on the river to supply a deficiency of water in the Erie canal, as in this case, and to settle and adjust the damages of the riparian owners. That this power was possessed by the state officers under the act of 1833, seems to be the view hitherto taken of the question, and we see no reason to doubt its correctness.

Thus much has been said in justification and approval of the course of the state officers. There has been no usurpation of

authority on their part in dealing with, and adjusting and settling the damages to the riparian owners, for the use by the state of the Black river. The river has never been permanently appropriated, so as to call for an appraisal of damages to the riparian owners for all time to come. The state, through its officers, has temporarily appropriated the waters of the stream to supply a portion of the Erie canal in times of deficiency, but has never appropriated and set apart the river for the exclusive and permanent use of the state. The state officers have carefully avoided assuming such a position as to place it in the power of all the mill and land owners on the Black river below the state dam, to claim full compensation for their property taken for public use. Officers charged with the care and superintendence of the public works have never intended to permanently appropriate the Black river in the sense of the statute, nor have individuals interested therein so regarded their action.

It has been reserved to the secretary of those officers to discover, (arguing from what they were authorized to do in constructing a canal feeder, and what they have done to pass a portion of the waters of the river through such feeder,) that they have permanently appropriated the river to the use of the state, and hence, when using the water and injuring the riparian owners by a temporary diversion of it, they have no power whatever to adjust and settle the damages sustained. But if there were really a serious question as to the authority of the canal commissioners to adjust and settle the damages accruing to the riparian owners, from a use of the waters of the Black river, when and from what source does the secretary of the canal board derive his power to sit in judgment on their acts? Who has invested him with authority to determine whether the commissioners, in the discharge of their duty, have acted legally or illegally? Was it ever intended by the legislature, to confer on the chief clerk of those functionaries having exclusive charge, the superintendence and management of the public works, the power to review their acts, and, as in this case, when the draft of a commissioner, regular on its face, is presented to him for payment, to look behind such draft and institute an inquisitorial and judicial examination into

The People *v.* Schoonmaker.

the authority of the officer drawing it? The office of auditor of the canal department was created in 1848. Prior to that time, the duties imposed had been discharged by a clerk of the comptroller, (with the exception of drawing warrants upon the treasurer,) and who was styled chief clerk of the canal department. This clerk held his appointment from the commissioners of the canal fund. In 1848, the name of his office was changed to that of auditor of the canal department, but not the manner of his appointment, and all his powers and duties; and all the powers and duties of the comptroller, in relation to the canals, except the powers and duties of the latter as commissioner of the canal fund, were transferred to and vested in the auditor, and he was made secretary of the commissioners of the canal fund, and of the canal board. The powers and duties thus vested in the auditor, were strictly of a ministerial character. The act further provided that the commissioners of the canal fund should devise and procure a seal for the auditor; that all books and papers pertaining to his duties, or to the duties of the commissioners of the canal fund, or of the canal board, should be securely and safely kept by him; that he should (instead of the commissioners of the canal fund) employ and pay the necessary clerks in the canal department. That dues to the state which had before been paid to the commissioners of the canal fund should be paid into the state treasury, and all balance standing to the credit of the commissioners of the canal fund in any depository should be transferred to the credit of the treasury of the state. That all moneys, at the passage of the act, authorized by law to be paid or advanced by the commissioners of the canal fund, and all moneys thereafter authorized to be paid and advanced from the canal fund, should be paid by the treasurer on the warrant of the auditor instead of the comptroller, the auditor countersigning and entering all checks drawn by the treasurer, on payment of his warrants, and all receipts for canal moneys paid to the treasurer. But no warrant should be drawn by the auditor on the treasurer unless authorized by law, and every warrant should refer to the law under which it was drawn: and that the auditor instead of the

commissioners of the canal fund, should keep the accounts of receipts and payments on account of the canals.   The object of the act was to separate the ministerial duties pertaining to the canals, from the control and supervision of the comptroller, in law, as they had mainly before been separated in fact.   But as has been truly remarked, " power is always at war with its own boundaries," and not long subsequent to the passage of the act in 1848, " in relation to the canal department," he who had been but the clerk of the canal board, and whose duties were purely ministerial, and upon whom the legislature had conferred no new powers other than those of a ministerial character, arrogates to himself the right of questioning the legality of the acts of the state officers, and even of the legislature itself.

The office of auditor was magnified beyond the intention of the legislature, not only into one of a ministerial ·but of a judicial nature; assuming to judge and pass upon the legality of the acts of the canal commissioners, and even of the commissioners of the canal fund and of the canal board, of which, by law, he was constituted the secretary.·  The success which crowned this assumption of power has emboldened the secretary in this case to step out of the line of his duty and power to teach his superior that he has totally misapprehended his duty, and by a manifestation of what is popularly termed an " obstinate integrity," save and protect the state funds from the vandal devastation of those specially charged with their custody and disbursement, and who alone are accountable to the public for a legal and just disbursement of them.   The act of 1848, creating the office of auditor, conferred upon him no power to look behind the draft and adjudge that the commissioner was without the authority to make it.   If he may do this in the present case he may do it in all cases where he is called upon by the state officers to draw his warrant on the treasurer for money belonging to the canal fund.   His powers are strictly ministerial.   He has certainly no supervisory power over the acts of the canal commissioners ; nor is he invested with authority to decide upon the validity of those acts.   If invalid he is not made responsible for them, and he requires nothing more as his protection in drawing the war-

The People *v.* Schoonmaker.

rant than the draft of the commissioner, who, as in this case, has settled and adjusted the claim on which the draft is founded. ·Though the act creating the office of auditor provides that no warrant shall be drawn by him unless authorized by law, the provision constitutes no basis or foundation for the building up an assumption of the extraordinary power claimed, to adjudge and control the action of the canal commissioners, or pass judicially on the question of their authority. The auditor has no power to settle a claim for the use of water temporarily appropriated for state purposes, or to pass upon the question whether such water, in a particular case, had been temporarily or permantly appropriated. The provision simply means that he may not, in drawing his warrants on the treasurer, divert the funds of the state to purposes unauthorized by law. It was intended rather as a restraint upon the illegal conversion of the state funds by the auditor himself acting ministerially, than any grant of power to him to sit in judgment on the acts of the canal board, or any member of it, with a view of determining the question whether the duty with which they had been clothed had been legally or otherwise discharged.

In this case the commissioner in charge of the canal adjudicated upon the claim of Post; he fixed and agreed upon a specific sum to be paid him as damages for a temporary diversion of water from his mill to supply a deficiency in the Erie canal during a small part of the years 1849 and 1850. The commissioner made his draft upon the auditor of the canal department, to which was annexed Post's receipt in full for such damages. It was the duty of the auditor to pay the draft. Possessing no authority to pass on the validity or invalidity of the act of the commissioner in determining that the damages accrued for a temporary purpose, payment was improperly refused. The order of the special term, awarding a peremptory *mandamus,* should be affirmed, with ten dollars costs.

[ALBANY GENERAL TERM, May 7, 1855. *Harris, Wright* and *Watson,* Justices.]